UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) No. 2:21 CR 64 |
| v. | ) |
| | ) Chief Judge DeGuilio |
| | ) |
| DANIEL URQUIZA | ) |

**<u>DEFENDANT DANIEL URQUIZA'S SENTENCING MEMORANDUM</u>**

Defendant Daniel Urquiza, by his attorneys, Theodore T. Poulos and Eric S. Pruitt of Cotsirilos, Tighe, Streicker, Poulos & Campbell, respectfully submits Defendant's Sentencing Memorandum.

**I.    INTRODUCTION**

Daniel Urquiza is 46 years old. He is married and has a six-year-old daughter, Emelia, to whom he is a devoted father. As attested to in the numerous character letters submitted to the Court, the offense conduct is an aberration in an otherwise exemplary, law-abiding and productive life in which Mr. Urquiza has focused his energies on work and being a source of support for his family and friends. Since his father's death, Mr. Urquiza has been a bedrock of stability and support for his mother by helping her run the family business, doing her grocery shopping, and taking her to medical appointments. He is a dedicated husband and dotting father who is deeply involved in the life of his young daughter. And as attested to in the numerous letters from those who have known and worked with him over the years, Mr. Urquiza has consistently been a model of hard work, humility, and dedication to family and friends.

Mr. Urquiza now comes before the Court having pled guilty to felony tax charges based on Mr. Urquiza having made personal expenditures directly from several business

accounts and using cash revenues of those businesses for personal expenditures while failing to claim any of these funds as income on his personal tax returns. In all, from 2014 to 2018, Mr. Urquiza failed to report income with a resulting tax loss to the United States of $145,432.

In the more than two years since Mr. Urquiza was first contacted by the government, he has accepted responsibility and come to terms with his conduct, has expressed his sincere and abject remorse, and has addressed the overspending that, in part, led him to use business funds for personal expenses while living what was an otherwise highly laudable life. Most significantly, Mr. Urquiza has been diligently saving his money and stands ready to make a substantial payment toward the restitution owed to the United States upon entry of the judgment.

Mr. Urquiza is ready to accept the Court's sentence and is anxious to complete that last portion of this unfortunate episode so he can rejoin his wife, daughter, mother, and friends. We respectfully submit that even though Mr. Urquiza's offense conduct was serious, he presents a compelling case for leniency. We urge the Court to credit the fact that Mr. Urquiza led a laudatory life until he succumbed to the overspending and mismanagement of his finances that led to the instant offense. Finally, we urge the Court to recognize that Mr. Urquiza, who has already suffered great shame and public humiliation, will also soon face the reality of being a convicted felon and all of the life-long consequences that this brings.

Accordingly, as further explained below, we respectfully request that the Court sentence Mr. Urquiza to a term of probation of two years, along with a significant community service obligation (pursuant to USSG §5B1.3(e)(3)), and whatever other

conditions the Court deems appropriate. To the extent that the Court finds some form of confinement is required as part of the sentence, Mr. Urquiza respectfully requests that the Court consider a form of home confinement that would allow him to remain a daily presence in the life of his daughter and to continue in his role as primary caregiver to his elderly mother. Pursuant to the dictates of 18 U.S.C. §3553(a), such a sentence would appropriately address the facts of the instant offense, Mr. Urquiza's history and characteristics, and the need to impose a sentence that is sufficient, ***but not greater than necessary***, to accomplish the sentencing and societal goals of punishment, deterrence, rehabilitation, and a return to productive citizenship.

## II. DANIEL URQUIZA'S BACKGROUND AND CHARACTER

Mr. Urquiza was born in 1975 in Hammond, Indiana. (PSR at ¶44). Mr. Urquiza's father and mother came to the United States from Argentina, settling in the Chicago area. (Ex. A, Daniel Urquiza Letter). Growing up, Mr. Urquiza worked for his parent's business (Meyer's Castle in Dyer) and later started his own businesses — Lost Marsh restaurant in Hammond and RSR Demolition. (PSR at ¶¶61-62). Mr. Urquiza has a close relationship with his mother and his two brothers and maintains regular contact with them. (PSR at ¶¶46-47). Since his father's death in 2018, Mr. Urquiza has spent a substantial amount of time visiting his mother and assisting her with various tasks, including management of Meyer's Castle. (PSR at ¶45). Mr. Urquiza has been married since 2013 and is the father of one daughter, Emelia, who is six. (PSR at ¶48).

### A. Mr. Urquiza's Commitment to His Family

Mr. Urquiza has remained a devoted son to his parents (his father being deceased since 2018) and brother to his siblings, coming to their aid numerous times throughout their lives. As one example, his brother John Paul described how Mr. Urquiza cared for his father

at the end of his life:

> Before our father passed in 2018, Daniel did everything he possibly could to spend every moment he had left with our father when he was sick. Daniel would stay all day, and sleep nearly every night at the hospital, not only to make sure to the best of his ability that any information needed was correctly relayed so that there would be less chance of confusion or mishaps with our father, but more importantly, to always be there in case dad woke up, so that our father would never have to be alone in the hospital room. Many times, with little notice, Daniel would have to drive our father long distances to different states for medical attention as flying was very hard on dad at that stage. Daniel put all of the responsibility and accompanying stress of our father's situation upon himself, and carried it then, and continues to carry it now, by helping our mother every day with all and any of her needed tasks, both big and little.

(Ex. D, John Paul Urquiza Letter).[1]

Similarly, after his father passed, Mr. Urquiza took it upon himself to attend to all his mother's needs. In her letter to the Court, Mr. Urquiza's mother, Elizabeth, speaks about her son's selfless dedication to her after her husband's passing:

> I have three children- all boys. All have been great to me, and I share a special bond with all three of my sons. However, during my husband's illness it was Danny who was there every step of the way. He was my husband's best friend. We were all devastated by my husband's passing but Danny took it the hardest. Throughout the grieving period, Danny was there for me 24/7 and to this day he still is. He filled my husbands' shoes in every aspect possible from assisting me with everyday needs to running our family business.
>
> I am a cancer survivor and have been dealing with a few other health issues . . . Since I am unable to drive, Danny takes me to all my doctor appointments, does my grocery shopping, and of course helps me run our family business every single day. He is my main caretaker, protector, and best friend.

(Ex. C, Elizabeth Urquiza Letter).

Mr. Urquiza's brother similarly observed how Mr. Urquiza came to his mother's

---

[1] Letters of support cited in this memorandum are attached as individual exhibits. Other letters of support are attached as Group Exhibit K.

aid following their father's death:

> Our mother does not drive and has trouble walking. She is completely dependent upon Daniel, as he's the only one that drives her to her doctor appointments as well as helps her with all necessary errands. Every-night, Daniel also helps our mother walk up the stairs to her bedroom, as she cannot do it on her own due to needing a knee replacement. As he was for our father, Daniel is also still there for our mother in every regard, everyday.

(Ex. D).

Mr. Urquiza's siblings have always viewed him as a model of strength and decency to whom they looked up to, even as children. Mr. Urquiza's brother, John Paul, wrote:

> Ever since I was a child, Daniel constantly showed that he had a huge heart with a tremendous amount of love for his family and others. He has always provided the guidance and help that a younger brother like me needed from his older brother when growing up. He is the best brother that a younger brother could hope to have.

(*Id.*).

Mr. Urquiza has been married to his wife, Orinta Urquiza, for 8 years. Mr. Urquiza and his wife have one child, Emelia, who is six. In their letters, his wife, mother, brother and cousins all attest to the ways in which Mr. Urquiza has provided his daughter with a stable, loving, and nurturing home life. (Exs. B – E, J). He is a dedicated father and husband who has been deeply involved in raising his daughter. As his cousin, Rocio, explains in her letter:

> Another wonderful characteristic of Danny is that he is an incredible family man. He provides for his family and loves them very much. He is truly a devoted father to his daughter Emelia. He takes her to school every day. He tends to her every need and want. I have watched their interactions. When he looks at her, it is filled with so much enjoyment, pride, and love. When Emelia talks to him, it is with absolute trust, comfort, and also love. Their bond is unmatched. It's beautiful. I can only imagine the damage and pain that would be caused if there were separation for any long periods of time.

(Ex. J, Rocia Urquiza Halloran Letter).

Indeed, Mr. Urquiza's example of selfless dedication to family have left an indelible mark on those close to him. As his cousin, Hector, writes in his letter:

> I have observed how deeply he loves and cares for his young daughter, Emilia, and how close they are.  I have seen him tend to his mother with great love, patience and kindness during very challenging times with her health.  He is emblematic of what a good son is towards his mother which inspires me to want to be a better son. Perhaps there is no better demonstrated example of his love, devotion, kindness, loyalty and so many other virtues than when he stood by his ailing father's side during several painful weeks as he was fighting for his life.

(Ex. E, Hector Urquiza Letter).

### B.  Mr. Urquiza's Commitment to his Friends and the Community

In addition to the essential role he has played in the lives of his family, numerous individuals have written the Court to attest to the ways in which Mr. Urquiza positively impacted their lives, describing the many ways in which Mr. Urquiza has been generous with his time and been a model for the importance of hard work and integrity.  (Exs. F - I; Group Ex. K). Several people wrote about the ways in which Mr. Urquiza was present for those around him during difficult times in their life, including Mercedes Parrilli, who wrote about how, when she was going through a divorce, Mr. Urquiza "would frequently call me and pick me up and take me to dinner and listen to me. It was all to make sure that I was ok and never down."  (Ex. H, Mercedes Parrilli Letter). Similarly, John Parrilli, wrote about how Mr. Urquiza went out of his way to help him when he was out of work in 2017:

> [I was] unemployed and desperately looking for a job During this time, I interacted with many friends and colleagues seeking both advice and help in my job search. Although our careers and backgrounds were completely different, Daniel was extremely supportive and put a lot of effort into trying to help by introducing me to every person he knew with a remotely similar background. What I really appreciate when I reflect upon this time is that I never asked Daniel for help. He just did it because he knew our situation

6

> and truly wanted to see it get better. At the time I had numerous contacts who I have had good relationships with and even mentored in the past that did not give the effort Daniel did while expecting nothing in return.

(Ex. I, John C. Parrilli Letter).

Similarly, numerous people wrote about how they have learned and benefited from the example of Mr. Urquiza's work ethic. Eric Ganz, who has known Mr. Urquiza for over 30 years, wrote about how Mr. Urquiza "worked hard to create several successful ventures . . . [and] embraces responsibility and thrives in the position of modeling hard work and dedication to his family." (Ex. F, Eric Ganz Letter). Another friend, Jason Taylor, wrote about how he learned from Mr. Urquiza work ethic:

> I worked at Meyer's Castle and the education I received there set me up for my entire life. It was long days doing everything from valet parking, busing tables, plating wedding dinners, breaking down large tents, and anything else that just needed doing. During every bit of the non-glamorous behind the scenes moments, Dan was right there with me; scrubbing the bathroom floors, plunging the toilets, and doing whatever had to be done during the 16 hour shifts we'd pull. It was exhausting. One night, I had just gotten done mopping the floors and accidently knocked over the bucket of dirty water all over the floor I had just cleaned. Dan came around the corner and saw me standing over the accident. All he said was, "go home and get some rest, I got this." He then proceeded to run away with the mop so I couldn't do it myself even if I wanted to. I came back the next day determined to outwork him. I failed. The lessons and education I received working there were many, but most impressive is that I can't even begin to explain how much Dan and every member of his family went out of their way to ensure that every guest and employee felt like family and that nobody was going to outwork them.

(Ex. G, Jason Taylor Letter).

As the PSR and the numerous attached character letters amply demonstrate, aside from the conduct underlying this case, Daniel Urquiza is an extraordinarily kind and decent man who has lived a remarkably good life, has been a supportive and loving father and son,

7

and an inspiration and role model for many. Mr. Urquiza's personal characteristics make it abundantly clear beyond peradventure that he is not a danger to the community and poses no risk of recidivism. Indeed, it is equally clear that Mr. Urquiza will certainly continue to be a productive, law-abiding member of society from this day forward and will use his substantial experience, energies, and abilities to work for the betterment of others and his community if the Court permits him to do so.

### III.   THE ADVISORY GUIDELINE CALCULATIONS

As set forth in the plea agreement, the parties agree regarding the initial Guidelines calculations. (Plea Agmt. at ¶7). Mr. Urquiza has zero Criminal History points, and an Offense Level 13 in Category I yields an advisory range of 12-18 months. (*Id.*). For the reasons set forth herein – including his background and characteristics, his role as his elderly mother's primary care giver, and the fact that he is neither a danger to the community nor a danger to re-offend – Mr. Urquiza requests a sentence substantially below the advisory Guidelines range.

### IV.   SECTION 3553(a) FACTORS AND DANIEL URQUIZA'S SENTENCING REQUEST

As the Court is aware, the federal Sentencing Guidelines are not binding, but merely advisory. Moreover, the advisory Guidelines range is not presumed to be the "correct" sentence to be imposed; indeed, it is error for a sentencing court to presume the advisory range is the appropriate sentence. *Nelson v. United States*, 555 U.S. 350 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also *not to be presumed reasonable*.") (emphasis in original); *Hawkins v. United States*, 706 F.3d 820, 823 (7th Cir. 2013) ("Not only do the guidelines no longer bind the sentencing judge; the judge may not even *presume* that a sentence within the applicable guidelines range would

8

be proper.") (emphasis in original). Instead, the Court's sentencing decision is to be individualized and committed to its sound discretion guided only by the parameters of the statutory maximum and minimum sentence, the factors enumerated in 18 U.S.C. §3553, and the directive to impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing set forth in §3553(a)(2). *Hawkins*, 706 F.3d at 823. As is often mentioned, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38 52 (2007), quoting *Koon v. United States,* 518 U.S. 81, 113 (1996). As aptly stated by one sentencing court:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006).

A. **Section 3553(a) Factors**

The sentencing purposes of Section 3553(a)(2) are to: (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of a defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. §3553(a)(2). Further, whenever applicable, a sentencing court must consider the following factors:

9

(1) the nature and circumstances of the offense and the history and characteristics of the defendant (§3553(a)(1));

(2) the kinds of sentences available (§3553(a)(3));

(3) the sentencing guidelines and pertinent policy statements issued by the Sentencing Commission (§3553(a)(4)-(5)); and

(4) the need to avoid unwarranted sentencing disparities among similarly situated defendants (§3553(a)(6)).

As the Supreme Court has emphasized relating to the district court's discretion, the punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted) (emphasis added). Moreover, it is the sentencing court's decision what weight to place on any one of these individual factors. *Gall*, 552 U.S. at 47 ("We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."); *United States v. Reibel*, 688 F.3d 868 (7th Cir. 2012) ("sentencing judges have discretion over how much weight to give a particular factor . . . within the bounds of reason . . . and those bounds are wide.") (internal quotations omitted).

In light of the law cited above, the tenets of §3553(a), and the facts both of this case and Mr. Urquiza's personal life history, we respectfully request that the Court impose a sentence of a two-year term of probation along with a significant community service obligation and any other conditions the Court deems appropriate. Based on all the facts outlined herein, such a sentence will be "sufficient, but not greater than necessary" to accomplish all the sentencing goals set forth in 18 U.S.C. §3553.

B.  **Satisfying the Purpose of "Deterrence" Does Not Require a Custodial Sentence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white collar offenders in particular has found no difference in the deterrent effect of probation and that of imprisonment. *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White–Collar Defendants?*, 61 Wayne L. Rev. 27, 40–41 (2015) (indicating that studies show certainty of punishment has a greater impact than increasing the level of punishment); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . ***prisons do not reduce recidivism more than noncustodial sanctions.***" Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (emphasis added).

C.  **Daniel Urquiza Poses No Risk of Recidivism**

Mr. Urquiza—a first-time offender—is now a 46-year-old husband and father, who has been employed throughout his adult life. Mr. Urquiza has genuine remorse for his offense. As Mr. Urquiza wrote in his letter to the Court:

> I am deeply ashamed to be writing this letter.  There is nothing in my family background, my upbringing, my education or my work that would have led to or predicted this outcome for my life and career.  I have disgraced my family's name.  When this case started I was not even able to look my dear mother in the eye.  And I have shed many tears thinking of what my father would have thought of me if he were still alive, not to mention my lovely and devoted wife, Orinta.  And I can't imagine being forced to leave my six year old daughter, Emelia, who is everything to me.  The heartache has been unbearable.  But I know I only have myself to blame.

(Ex. A).

     Mr. Urquiza has every incentive one can imagine to avoid reoffending. As is clear from the letters of support the Court has received, as well as Mr. Urquiza's own letter to the Court, family means everything to Mr. Urquiza. The understating that, due to his own conduct, he will likely be taken away from his family has already had a significant impact on Mr. Urquiza. As he wrote to the Court:

> I was raised in a very respectful hard-working very strongly family orientated upbringing.  I am blessed with a beautiful wife and a beautiful daughter, and I support and care for them very, very much.  My father passed away three years ago and my mother is a cancer survivor and I care for her on a daily basis.  And spend every spare minute of every single day with my daughter.  We read  books, play sports and games together, and a try to be part of her daily routine as much as possible.  I take her to and pick her up from school every day.  She is the world to me.  I am heartbroken that I have put myself in this position. . . .
>
> The only way I have been able to get through the last year or so is by the amazing grace and enormous strength of my wife, Orinta.  She has been my rock.  Of course, she was livid when she found out what I had done and that I put our happy family life and the future of our daughter in jeopardy.   But as the days and weeks and months passed she, like my mother, has forgiven me.  And I am most grateful for that.  I apologized to her and my entire family a thousand times and I have promised her, what I sincerely promise Your Honor:  I will never, ever do anything again to violate the laws of this country which has given so much to my entire family.

(*Id*.)

Mr. Urquiza is an extraordinarily dedicated father and son who plays a significant role in the lives of both his six-year-old daughter and his elderly mother. Following his conviction, it is beyond question that he will do everything in his power to avoid anything that would further imperil his ability to be present for his family.

Based on all the factors present with Mr. Urquiza, we can confidently state—and the Court can confidently find—that Mr. Urquiza poses absolutely no risk of re-offending in any manner. Accordingly, the sentencing concerns of "incapacitation" and "protecting the public from further criminal activities by the defendant" are not present in this case, which means the need for a prison sentence of any length is significantly diminished.

The case law, too, makes clear that in imposing the lowest sentence sufficient to account for the need to protect the public from further crimes of the defendant, this Court should consider the statistically low risk of recidivism presented by Mr. Urquiza's age, history and characteristics. *See, e.g.*, *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Urbina*, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

**D.  Mr. Urquiza's History and Characteristics Warrant a Reduced Sentence**

The "history and characteristics" of Daniel Urquiza – much of which is discussed above and in the letters attached to this submission – weigh heavily in favor of a sentence well below the advisory Guidelines. Mr. Urquiza's conduct involved in this case ended over two years ago, in 2018. In the four years since, he has continued to be a positive contributor to his community, and he remains intimately involved with his family. He has not done anything even close to violating the law, and never will. Demonstrated "post-

offense rehabilitation" was an appropriate basis for a downward departure even under the old, mandatory Guideline regime (*United States v. Sally*, 116 F.3d 76 (3d Cir.1997)(downward departure for post-offense rehabilitation efforts was proper); *United States v. Core*, 125 F.3d 74 (2d Cir. 1997)(same); *United States v. Neuendank*, 2004 WL 419915 (N.D. Ill. Feb. 23, 2004) (delay in prosecution either alone, or in combination with post-offense rehabilitation, warrants downward departure)(collecting cases)), and is certainly a proper consideration now that the Guidelines are merely advisory.

The conduct at issue here is clearly a severe departure from what Daniel Urquiza has done with his life, both before, during and after the conduct at issue. As discussed above and in several of the letters attached to this submission, Mr. Urquiza's life has been—and continues to be—defined by caring for others. While he committed a serious crime, there should be no doubt that the conduct underlying this case does not define Daniel Urquiza, or the type of person, father, son, and citizen he is, and will continue to be. Mr. Urquiza has already paid a significant price for his conduct. He has carried the shame of his conduct being widely publicized in the press and known throughout the community of Northwest Indiana, where he will always be known as a convicted felon. He has had to go through this process publicly and in front of family which has caused him great distress, despite their unfailing support of him through this process. As Mr. Urquiza explains:

> But for the death of my humble father who was my hero and guiding light all my life, this has been the most painful time of my life. The shame of having to tell my family what I did, that I committed a crime, has been more painful than any other punishment I can imagine. Ever since this nightmare began I have lost weight. I have not been able to sleep. I wake up in the middle of the night all the time with fear and anxiety that never goes away. And all these sleepless nights have been made so much worse because of the tinnitus I now have and the constant ringing in my ears and in my head that never goes away. I wish I could find the words to explain how tortuous the nighttime has

>  been for me.

(Ex. A). His devoted wife, Orinta, similarly notes how this has impacted Mr. Urquiza:

> Dan has not slept through the night even once since this whole case started. He has tossed and turned and feels so much guilt and shame. We have cried ourselves to sleep so many times. He feels so much shame and says that he has ruined the good name of his family. I keep telling him that is not true, that everyone who knows him knows that he is such a good person and that everyone makes mistakes.

(Ex. B). All of this has clearly taken a toll on Mr. Urquiza, and all of this has served its own unique form of punishment that should not be ignored or discounted in arriving at a reasonable sentence for *this defendant* under the facts of *this case*. Because he is a man of good character, Mr. Urquiza recognizes that can use the lessons he has learned through this ordeal as an important teachable moment for his daughter: "[W]hen Emilia is old enough to understand, I will use my fall for grace to teach her that from my shameful example she must learn to always do right and lead a straight and narrow life." (Ex. A).

### E. **Mr. Urquiza's Role as His Mother's Caregiver is a Significant Mitigating Factor**

Another significant mitigating factor weighing in favor of a non-custodial sentence is Mr. Urquiza's role as a caregiver for his elderly mother. Mr. Urquiza acknowledges that separation of defendants from their families is a consequence of a custodial sentence for all defendants and this fact does not, on its own, necessarily weigh in favor of a below-Guidelines sentence. However, as discussed above and in numerous letters to the Court (Exs. A - G, Group Ex. K) since the passing of his father in 2018, Mr. Urquiza has played a unique and significant role in his mother's life. As his brother, John Paul, wrote to the Court, "[our mother] is completely dependent upon Daniel, as he's the only one that drives her to her doctor appointments as well as helps her with all necessary errands. Every night, Daniel also helps our mother walk up the stairs to her bedroom, as she cannot do it on her

own." (Ex. D). This is a mitigating circumstance that the Guidelines do not take into consideration and that warrants a sentence below the Guidelines range. A sentence of probation or, in the alternative, a probationary sentence with a period of home confinement, would allow Mr. Urquiza to continue playing this vital role in his mother's life while still accomplishing the sentencing and societal goals of punishment, deterrence, rehabilitation, and a return to productive citizenship.

F. **The Need to Avoid Unwarranted Sentencing Disparities Among Similarly-Situated Defendants**

Section 3553(a)(6)) requires courts to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Mr. Urquiza respectfully submits that this Court's sentencing of the defendants in *United States v. Closson* (3:20-CR-052) is instructive as to an appropriate sentence in this case. In *Closson*, the defendants were a married couple and small business owners who pled guilty to conspiracy to defraud the United States, with Mr. Closson also pleading guilty to an additional count of tax evasion. Over a five-year period, defendants concealed more than $2,000,000 in income from the IRS and filed false joint income tax returns, resulting in a tax los to the United States of more than $600,000 and a state tax loss of $300,000. (Government Sentencing Memo, Dkt. Nos. 44 and 45 at 4). Beyond simply underreporting their income, defendants engaged in structuring and other steps to avoid the creation of currency transaction reports. In addition to the tax fraud, defendants also engaged in a separate Medicaid fraud scheme. *Id*. at 5. Defendants used the unreported income to purchase luxury items that included expensive sports cars, multiple houses and jewelry. *Id*. Defendants had no criminal history, and each faced Guidelines sentencing ranges of 30 to 37 months. *Id.* at 1. This Court sentenced Mr. Closson to 15 months'

imprisonment, Mrs. Closson to probation, and ordered both defendants to pay $1,025,060 in restitution. Dkt. No. 46, 47.

Like the defendants in *Closson*, Mr. Urquiza has no criminal history whatsoever. Here, from 2014 to 2018, Mr. Urquiza failed to report approximately $722,209 in income to the IRS, with a resulting tax loss to the United States of $145,432. While Mr. Urquiza does not mean to undermine the seriousness of his conduct, the offense conduct here is far less egregious than that of the Clossons and did not involve structuring or similar conduct (let alone a separate Medicaid fraud scheme). Mr. Urquiza believes a non-custodial sentence is warranted based on the other 3553 factors already discussed above. However, Mr. Urquiza also believes that the reasonableness of his request is underscored by the sentences given in the *Clossen* case, and that the need to avoid unwarranted disparities in sentencing among similarly situated defendants calls for giving Mr. Urquiza a non-custodial sentence.

**CONCLUSION**

For all the reasons set forth herein, we respectfully request that the Court sentence Daniel Urquiza to a term of probation of two years — along with a significant community service obligation — and whatever other conditions the Court deems appropriate. Such a sentence in no way diminishes the offense or society's interests while also adhering to the mandate of 18 U.S.C. §3553(a) that the Court impose a sentence "sufficient, but not greater than necessary."

Respectfully submitted,

*/s/ Eric S. Pruitt*
Attorney for Defendant Daniel Urquiza

Theodore T. Poulos
Eric S. Pruitt
Cotsirilos, Tighe, Streicker, Poulos &
    Campbell, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345